# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA,**

    Plaintiff,

    v.                    Case No. 17-CR-90

**BRIAN LARIETH BELL,**

    Defendant.

## REPORT AND RECOMMENDATION ON
## DEFENDANT'S MOTION TO SUPPRESS (ECF NO. 20)

While on patrol during the evening hours of June 26, 2016, law enforcement officers received a tip that Brian Bell, a felon, was armed with a handgun near a particular Milwaukee intersection. A short while later, officers located Mr. Bell walking along the sidewalk in the area described by the informant. Mr. Bell ran from the police and discarded a firearm during the ensuing foot pursuit. He was eventually apprehended and charged in federal court with unlawful possession of a firearm by a felon.

Mr. Bell has moved to suppress the firearm, arguing that officers grabbed him without justification and that he ran in fear of his personal safety. According to the United States, Mr. Bell's flight was unprovoked, and officers reasonably arrested him after he ditched the gun. For the following reasons, the Court finds that the government's version of events is more credible than the version described by Mr. Bell. The Court will therefore recommend that Mr. Bell's motion be denied.

I.  **Factual Background**

In June 2016, a confidential informant provided information to Bill Feely, a detective with the Milwaukee Police Department (MPD), that led to the arrest of a subject for unlawfully possessing a firearm as a felon. *See* Transcript of Evidentiary Hearing on October 11, 2017 [hereinafter 10/11/17 Tr.] 36, ECF No. 33. On June 26, 2016, that same informant told Detective Feely that Brian Bell, a convicted felon, was armed with a handgun in the area of North 60th Street and West Congress Street in the City of Milwaukee. 10/11/17 Tr. 35–36. Detective Feely conveyed this information to several officers on patrol that night, including Chad Boyack and Anthony Milone. 10/11/17 Tr. 36; *see also* MPD Incident Report 161780169 [hereinafter Ex. 7], ECF No. 38-1. Officers Boyack and Milone obtained a photograph of Mr. Bell, confirmed that he had a prior felony conviction, and proceeded to 60th and Congress to look for him. 10/11/17 Tr. 36–37; Ex. 7. Officer Boyack was driving a marked squad car; Officer Milone was sitting in the front passenger seat. 10/11/17 Tr. 34–35; Ex. 7. The parties dispute what happened next.

**A. Officer Malone's version of events**

According to Officer Malone, he and Officer Boyack were driving westbound on West Congress Street at 9:53 p.m. when they observed an individual walking west on the north sidewalk in the 6300 block of Congress Street. Ex. 7; *see also* 10/11/17 Tr. 37–38. When the officers were about thirty feet away, the individual turned around and looked at the squad car for a second or two. 10/11/17 Tr. 38. Officer Milone believed that the individual was Mr. Bell. Although it was dark outside at the time, Mr. Bell was illuminated by a street lamps. Also, the individual

2

had long braided hair, just like Mr. Bell did in the photo. The individual then turned away from the officers, grabbed his right front pocket with his right hand, and turned northbound on the east sidewalk of North 64th Street. 10/11/17 Tr. 38–39.

The squad car turned north onto 64th Street, following behind the individual. 10/11/17 Tr. 39. When the squad was about fifteen feet away, the individual turned to look back at it again and then took off running, first a few more steps north and then northeast through the yards. The squad stopped and Officer Milone exited, yelled "Stop, police!" and gave chase when the individual refused to halt. 10/11/17 Tr. 39, 41–43. During the foot pursuit, Officer Milone kept his flashlight shined on the individual and continued to yell "Stop, police!"

When he was about forty-five feet behind, Officer Milone observed that the individual was holding a dark gun in his hand. Officer Milone lost sight of the individual behind a garage, and when he reemerged he was no longer carrying the gun. Officer Milone eventually located the individual in the backyard of a house located on North 65th Street. The individual was arrested and later confirmed to be Brian Bell. *See* Ex. 7. Officers subsequently found "a loaded .40 caliber 'Smith & Wesson' silver over black semi-automatic handgun" in the backyard of a house on 64th Street. Ex. 7.

The officers did not activate the squad car's emergency lights or shine a light on Mr. Bell before he ran. 10/11/17 Tr. 43–45. Nor did they issue any commands to him. At the time Mr. Bell began to run, other squad cars were in the area, but they

were not directly behind the squad driven by Officer Boyack. Officer Milone was not equipped with a body-worn camera at the time of the incident.

### B. Mr. Bell's version of events

According to Mr. Bell, immediately prior to his arrest on June 26, 2016, he was talking on the phone while walking home from the gas station located on the corner of 60th Street and Congress Street. 10/11/17 Tr. 6–9, 17. He was walking westbound on Congress on the north sidewalk, and when he turned north onto 64th Street, a police squad pulled up on the side of him and the squad's passenger said, "Hey you, come here." The squad stopped at an angle toward him five to ten feet from the curb. 10/11/17 Tr. 9, 18–19; *see also* Exhibit 2.

At this time, another squad car pulled up behind the first squad. 10/11/17 Tr. 10–13, *see also* Ex. 2. The passenger of the second squad exited the vehicle and crouched down, shielding himself behind the passenger door. Based on the officer's positioning, Mr. Bell believed he had his weapon drawn. Mr. Bell, however, never actually saw the officer holding a gun.

When the passenger of the first squad car told Mr. Bell to "come here," Mr. Bell hung up his phone, took a few steps toward the officer, and said "What you stopping me for?" 10/11/17 Tr. 10, 19–20, 26. As the officer was exiting the squad, he lunged at Mr. Bell and grabbed his shirt. 10/11/17 Tr. 13, 19–20, 26–28. Mr. Bell then took off running; after a foot pursuit, Mr. Bell was apprehended, arrested, and taken to the police station. 10/11/17 Tr. 13–14, 20–23; *see also* Exhibit 1. Mr. Bell indicated that he ran because he had a gun on him. 10/11/17 Tr. 29.

### C. Post-arrest events

Mr. Bell was interviewed at the police station by Chad Vartanian, an MPD detective. *See* Exhibit 6. Mr. Bell waived his *Miranda* rights and answered several identifying questions. Ex 6 at 11:38:00–11:42:08. Detective Vartanian then stated, "So tell me what happened." Ex. 6 at 11:42:23. Mr. Bell indicated that he was walking to the gas station on 60th and Congress and talking on his phone when he saw a police squad drive past him. Ex. 6 at 11:42:30–11:43:42. He turned around and began walking back toward his house. When he turned onto 64th Street, the squad did the same. One of the officers then said, "Hey you, come here." Mr. Bell responded, "What's up? I ain't even do nothing." The officer then exited the car, and Mr. Bell took off running. Mr. Bell told Detective Vartanian that he knew he was not supposed to have a gun and that he ran because he did not want to go to jail.

Mr. Bell further stated that he was carrying the .40 caliber Smith and Wesson in his back waistband and that he tossed it with his right hand while being chased by the officer. Ex. 6 at 11:43:42–11:45:22. He agreed with Detective Vartanian that he ran because he was a felon and he was not supposed to have a gun. Ex. 6 at 11:43:58–11:44:05. Thereafter, Detective Vartanian remarked, "So I understand that you might be able to help yourself, then, correct?" Ex. 6 at 11:45:25–11:45:30. Detective Vartanian told Mr. Bell that they could talk further, and he left the room, terminating the interview. Ex. 6 at 11:45:30–11:47:22.

At some point following Mr. Bell's arrest, Officer Boyack authored an incident report concerning the encounter. *See* Ex. 7. The report recounts the tip from the confidential informant, the steps Officers Boyack and Milone took to verify the tip,

5

and their driving to the area to look for Mr. Bell. The report further indicates that Mr. Bell was walking west in the 6300 block of West Congress Street when he "turned and looked directly at [the] marked squad car and then turned back around while grasping his right front shorts pocket with his right hand." Ex. 7. According to the report, Mr. Bell then "took immediate and unprovoked flight on foot north on the east sidewalk then eastbound into the residential yards of the 4400 block of N. 64th Street." Ex. 7.

The report then describes the ensuing foot pursuit, the apprehension of Mr. Bell, and the finding of the .40 caliber Smith and Wesson. The report does not mention any other officers being present at the time Mr. Bell ran. The report also notes that a subsequent record check revealed that Mr. Bell had multiple, active warrants for his arrest.

## II. Procedural Background

On May 23, 2017, Mr. Bell was indicted for knowingly possessing a firearm as a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Indictment, ECF No. 7. The matter is assigned to United States District Judge Pamela Pepper for trial and to this Court for resolving pretrial motions. Mr. Bell's trial has been adjourned. *See* Court Minutes for Status Conference, ECF No. 16.

On September 8, 2017, Mr. Bell filed a motion to suppress in which he requested an evidentiary hearing. Defendant's Motion to Suppress and Request for an Evidentiary Hearing, ECF No. 20. The Court conditionally granted Mr. Bell's request for a hearing, *see* Text Only Order, ECF No. 24, over the United States' opposition, *see* United States' Response to Defendant's Request for Evidentiary
6

Hearing, ECF No. 21. The Court held the evidentiary hearing on October 11, 2017, and heard testimony from Mr. Bell and Officer Milone. *See* Court Minutes for Evidentiary Hearing, ECF No. 25. During the evidentiary hearing the Court received into evidence a map depicting the general area of North 64th Street and West Congress Street, *see* Ex. 1, and a street image of that particular intersection, *see* Ex. 2.

Mr. Bell also offered into evidence a number of state-court criminal complaints in which Officer Milone was involved. *See* Exhibit 4; *see also* 10/11/17 Tr. 54–63. The United States objected, arguing that, contrary to the parties' agreement to reciprocal discovery, defense counsel had failed to provide this information to the government. The Court adjourned the hearing to allow counsel for the United States to review the materials. During a status conference the following day, the Court overruled the United States' objection to admission of Exhibit 4 but granted its request to discuss the exhibit with Officer Milone in preparation for the hearing. *See* Court Minutes for Status Conference Re: Evidentiary Hearing, ECF No. 27.

The evidentiary hearing resumed on October 23, 2017. *See* Court Minutes for Evidentiary Hearing, ECF No. 29. Officer Milone completed his testimony, and the Court received into evidence the criminal complaints, *see* Ex. 4, printouts outlining the disposition of each case described in the complaints, *see* Exhibit 5, and a copy of the video recording of Mr. Bell's interview with Detective Vartanian, *see* Ex. 6. The parties have submitted post-hearing briefs in support of their respective positions. *See* Defendant's Brief in Support of Motion to Suppress, ECF No. 38; United States'

Brief in Opposition to Defendant's Motion to Suppress, ECF No. 39; Defendant's Reply, ECF No. 40. Mr. Bell's motion is now ripe for decision.

### III. Discussion

Mr. Bell moves this Court, pursuant to Fed. R. Crim. P. 12(b), for an order suppressing all physical evidence obtained by law enforcement in connection with his arrest on June 26, 2016. *See generally* Def.'s Mot. In particular, Mr. Bell seeks to suppress the firearm officers located after the foot pursuit by Officer Milone, arguing that the recovery of that firearm resulted from an unlawful seizure of his person, contrary to *Terry v. Ohio*, 392 U.S. 1 (1968).

**A. Legal standard governing seizures**

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. A seizure occurs when, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)). "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Chesternut*, 486 U.S. at 573.

A seizure generally is "reasonable" only if it is based on probable cause to believe the individual has committed a crime. *See United States v. Howard*, 729 F.3d 655, 659 (7th Cir. 2013) (citing *Bailey v. United States*, 133 S. Ct. 1031, 1037 (2013)). Pursuant to the well-recognized exception under *Terry v. Ohio*, however, a

8

law enforcement officer may briefly stop an individual for investigatory purposes if he "has a reasonable suspicion . . . that criminal activity may be afoot." *United States v. Patton*, 705 F.3d 734, 737 (7th Cir. 2013) (citing *Terry*, 392 U.S. at 21–22). "Such a brief detention is permitted when it demands only a limited intrusion into an individual's privacy and rests on 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014) (quoting *Terry*, 392 U.S. at 21).

"While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "In other words, reasonable suspicion is less than probable cause but more than a hunch." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006) (citing *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003)). In determining whether a stop is supported by reasonable suspicion, courts "must examine the totality of the circumstances in the situation at hand, in light of the individual officers' own training and experience, and should uphold the stop if it finds that 'the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing.'" *United States v. Williams*, 731 F.3d 678, 683–84 (7th Cir. 2013) (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

**B. The seizure of Mr. Bell**

The parties dispute when Mr. Bell was seized for purposes of the Fourth Amendment. According to the United States, Mr. Bell was not seized until he was taken into custody after discarding the firearm during the foot chase. *See* U.S.'s Br. 9–15. Mr. Bell maintains that he was seized when Officer Milone grabbed him before he ran. *See* Def.'s Br. 16; Def.'s Reply 7–8. Due to the absence of any video evidence capturing the encounter, this factual dispute essentially turns on a credibility issue: Does the Court believe Officer Milone or Mr. Bell?

**1. Credibility assessment**

Courts and juries assess the credibility of witnesses by examining their demeanor while testifying, their biases, their ability to perceive the events in question, their memory, their character for truthfulness, whether they have made prior inconsistent statements, and whether their testimony has been contradicted by another source of information (e.g., video footage). *See* Section 3.01, Pattern Criminal Jury Instructions of the Seventh Circuit (2012 ed.) (revised Feb. 2013).

None of the first four factors provides much assistance in assessing credibility here. The demeanors of Mr. Bell and Officer Milone appeared to be equally sincere and composed at the hearing. They both have a reason to shade events to their own advantage: one to avoid jail, and the other to avoid having a prior felon walking the streets with a firearm. While one end may be nobler than the other, it is the intensity of desire for that end that matters. Moreover, I detected no defects in their abilities to perceive the events in question, and they did not seem to suffer from lapses of memory.

Likewise, each version of events appears equally plausible in the abstract. It is unsurprising to the Court that a felon armed with a gun and saddled with outstanding arrest warrants would run at the sight of law enforcement. The Court, however, can also imagine police officers attempting to catch off-guard a felon suspected of carrying a firearm in order to confiscate the illegal weapon.

As to character for truthfulness, Officer Milone enjoys a small advantage over Mr. Bell. This slight edge is due to Mr. Bell's prior conviction for a felony, because "one who has transgressed society's norms by committing a felony is less likely than most to be deterred from lying under oath." *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 523 (3d Cir. 1997) (quoting *Cummings v. Malone*, 995 F.2d 817, 826 (8th Cir. 1993)); *see also* Fed. R. Evid. 609.

Mr. Bell counters that this factor should actually favor him due to a previous finding by this Court that Officer Milone testified untruthfully. *See* Def.'s Br. 14–15 (citing ECF No. 33 in *United States v. Brantley*, 16-CR-188 (E.D. Wis. Mar. 13, 2017)). Mr. Bell is wrong; I made no such finding. In a prior ruling, I stated that "the Court makes clear that it is not suggesting that either officer testified untruthfully. Rather, it appears that Officer Milone's testimony merely reflects an inaccurate recollection *of the sequence of events*." *See* Recommendation on Defendant's Motion to Suppress, ECF No. 33 at 12 n.3 in *Brantley* (emphasis added). To this Court, Officer Milone's character for truthfulness is unsullied.

The factor that ends up proving decisive is the existence of Mr. Bell's prior statements, which were inconsistent with his testimony. Officer Milone's testimony, on the other hand, was not burdened with any such inconsistencies.

11

Shortly after his arrest, Mr. Bell told Detective Vartanian that he ran after the squad car followed him onto 64th Street and one of the officers told him to "come here." He never mentioned an officer grabbing hold of his shirt, the presence of a second squad car, or another officer crouching behind his open door and possibly having his weapon drawn.

The absence of these details from Mr. Bell's initial statement to law enforcement leads the Court to conclude that they were contrived at a later date. Mr. Bell was interviewed approximately an hour and a half after his arrest. Accordingly, the circumstances surrounding his arrest would have been most fresh at that time. This also would have been the time for Mr. Bell to deny guilt or question the lawfulness of the officers' conduct, if that in fact was the truth. Instead, Mr. Bell essentially confessed to the crime, explaining how it transpired and why he ran. Indeed, Mr. Bell told Detective Vartanian that he ran because he had a gun, not because he feared for his personal safety. This is the same answer Mr. Bell gave when I asked him at the evidentiary hearing why he ran from the police.

Mr. Bell claims that his testimony was simply more detailed than his post-arrest statement but not materially different from it. *See* Def.'s Br. 15. The Court respectfully disagrees. Mr. Bell's testimony closely tracked his post-arrest statement, save for three key details: Officer Milone grabbing him, the presence of the second squad car, and the second, possibly armed officer. These three details arguably are determinative of whether Mr. Bell's seizure was lawful. Without them,

12

as even Mr. Bell acknowledges, there would be no basis to suppress the firearm. The details Mr. Bell added therefore lie at the heart of the credibility dispute.

Mr. Bell seeks to explain the absence of these details by claiming that the circumstances leading to his arrest were "an insignificant component" of his conversation with Detective Vartanian. *See* Def's Reply 14–15. According to Mr. Bell, the purpose of the interview was to discuss his possible cooperation with law enforcement. This claim, however, is belied by the video recording of the interview. The interview was relatively brief, lasting only fifteen minutes. *See* Ex. 6. More than fourteen minutes was spent covering Mr. Bell's *Miranda* rights, obtaining identifying information from Mr. Bell, and having Mr. Bell describe the events leading to his arrest. Detective Vartanian did not mention Mr. Bell cooperating with law enforcement until the very end of the interview. Furthermore, it is clear from the interview that law enforcement would have declined Mr. Bell's cooperation if Detective Vartanian had not been satisfied that he was being forthright in acknowledging what he had done and why.

The final factor, contradiction by other sources of information, also undercuts Mr. Bell's testimony. Simply put, Mr. Bell's version of events seems physically implausible given the schematic description he provided. Mr. Bell testified that the first squad car stopped five to ten feet from the curb, that he reacted by taking a few steps toward that squad, and that Officer Milone then grabbed his shirt while exiting the car. Mr. Bell indicated that Officer Milone's door remained open, but it was not between him and the officer. *See* 10/11/17 Tr. 27. Given this description, the only way Officer Milone could have grabbed Mr. Bell is if Mr. Bell had been

13

standing in the middle of the street. *See* Ex. 2. Mr. Bell, however, testified he was only a couple steps from the sidewalk when he was grabbed.

Moreover, it seems unlikely that the second squad car would have been directly behind the first one at the time it stopped. Three squads were in the area trying to locate Mr. Bell. Given this objective, common sense dictates that the officers would have spread out their search rather than travel one after the other, and the sequence of events would not have provided the second squad sufficient time to arrive on scene as described. Moreover, the incident report would have noted that the second squad was present during the stop, *see* Ex. 7, and the second officer would have assisted in the foot pursuit, *see* 10/11/17 Tr. 44–45; 10/23/17 Tr. 24–25.

On the other hand, the Court has no objective basis for questioning Officer Milone's testimony. Officer Milone testified that he remembered "a lot of" the encounter with Mr. Bell and merely used the incident report to fill in particular details. *See* 10/23/17 Tr. 39–41. He provided three specific reasons why the encounter stuck out in his mind: Mr. Bell was incredibly fast, Mr. Bell tossed the gun remarkably far, and the incident resulted from a tip from a confidential informant. These reasons appear adequate to form a distinct memory of the incident.

### 2. Mr. Bell's attacks on Officer Milone's testimony

Mr. Bell submits several reasons why Officer Milone should not be believed, *see* Def.'s Br. 12–16; Def.'s Reply 6–13, but none of them is persuasive. *First*, Officer Milone's testimony was not materially different from the incident report. The report indicates that Mr. Bell looked back at the squad car and then took immediate and

14

unprovoked flight, while Officer Milone testified that Mr. Bell looked back twice before running. In either situation, Mr. Bell allegedly fled shortly after turning the corner onto 64th Street. *Second*, that Mr. Bell was carrying the firearm in his waistband and allegedly on the phone at the time does not negate the possibility that he grabbed his right front pocket prior to running. *Third*, the United States has provided credible evidence that, in mid-June 2016, Officer Milone did in fact make an arrest based on information provided by the same informant who tipped off law enforcement about Mr. Bell. *See* Declaration of Officer Anthony J. Milone, ECF No. 48-1.

*Finally*, that Officer Milone has on a number of occasions claimed unprovoked flight as a basis for making a stop does not undermine his credibility in this case. To be sure, the prior criminal complaints cited by Mr. Bell do appear to have been written using a template. *See generally* Ex. 4. But those complaints were drafted by state prosecutors, not Officers Milone or Boyack. Moreover, given Officer Milone's proactive policing assignment, it is unsurprising that many individuals engaged in illegal activity flee from him.

Accordingly, the Court finds Officer Milone's testimony to be more credible than Mr. Bell's. Mr. Bell therefore was not seized until he was apprehended by Officer Milone following the foot chase.

### C. Whether the seizure of Mr. Bell was reasonable

The seizure of Mr. Bell was reasonable based on the totality of circumstances confronting law enforcement. Mr. Bell's unprovoked flight provided officers with reasonable suspicion to conduct a *Terry* stop of him. *See Wardlow*, 528 U.S. at 124–

15

26. And they also had probable cause to arrest him based on his confirmed status as a felon and his discarding of a firearm during the chase.

## IV. Conclusion

Accordingly, for all the foregoing reasons, the Court will recommend that Mr. Bell's Motion to Suppress be denied.

**NOW, THEREFORE, IT IS HEREBY RECOMMENDED** that Brian Bell's Motion to Suppress, ECF No. 20, be **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C), Fed. R. Crim. P. 59(b), and E.D. Wis. Gen. L. R. 72(c), whereby written objections to any recommendation herein, or part thereof, may be filed within fourteen days of service of this Recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district judge shall result in a waiver of your right to appeal. If no response or reply will be filed, please notify the district judge in writing.

Dated at Milwaukee, Wisconsin, this 29th day of December, 2017.

BY THE COURT:

*s/ David E. Jones*
DAVID E. JONES
United States Magistrate Judge