UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                 Case No. 17-cr-90-pp

BRIAN LARIETH BELL,

        Defendant.

## ORDER OVERRULING DEFENDANT'S OBJECTION TO THE MAGISTRATE JUDGE'S RECOMMENDATION (DKT. NO. 52), ADOPTING THAT RECOMMENTATION (DKT. NO. 51), AND DENYING DEFENDANT'S MOTION TO SUPPRESS (DKT. NO. 20)

On September 8, 2017, the defendant filed a motion to suppress the gun that gave rise to his felon-in-possession charge; he argued that law enforcement stopped him, and seized the gun, in violation of the Fourth Amendment. Dkt. No. 20. Magistrate Judge David E. Jones began an evidentiary hearing on October 11, 2017, then adjourned it to October 23, 2017 to allow the defendant, over the government's objection, to question the arresting officer relating to reports he'd written in other cases. Dkt. Nos. 27, 30. On December 29, 2017, after post-hearing briefing, Judge Jones issued a report, recommending that this court deny the motion. Dkt. No. 51. Judge Jones's decision came down to credibility; he determined that the arresting officer's testimony that the defendant had fled after having seen the squad car was more credible than the defendant's testimony that the arresting officer had

told him to stop, then tried to grab him. Id. at 10-15. He concluded that the officers also had probable cause to arrest the defendant, under the totality of the circumstances—his confirmed status as a felon, his flight from the officers ("unprovoked"), and the fact that he tossed the gun during the chase. Id. at 15-16. The defendant objected to the recommendation, dkt. no. 52,  and the government responded, dkt. no. 53. Because Judge Jones based his recommendation on credibility of the witnesses, the court held its own evidentiary hearing on April 24, 2018, and reviewed the witnesses' credibility de novo. The court concludes that the defendant's testimony was not credible; it will overrule the defendant's objection to Judge Jones's recommendation and will deny the motion to suppress.

## I.     STANDARD OF REVIEW

Rule 59(b) governs dispositive motion practice initiated before magistrate judges. Fed. R. Crim. P. 59(b). Parties have fourteen days to file "specific written objections" to a magistrate judge's report and recommendation on a dispositive motion. Fed. R. Crim. P. 59(b)(2). When reviewing a magistrate's recommendation, the district judge must review de novo the recommendations of the magistrate judge to which a party timely objects. 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b)(2), (3). The court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. §636(b)(1).

## II.    FACTS

### A.    October 11, 2017 Evidentiary Hearing

On October 11, 2017, Judge Jones began the evidentiary hearing; the defendant and arresting Officer Anthony Milone offered conflicting versions of the events. Dkt. No. 33.

#### 1.    *Defendant's Version*

The defendant recalled talking on the phone while walking home from a gas station on Congress Avenue the evening of June 26, 2016. Id. at 9, 17. He testified that he turned right onto 64th Street, when two officers pulled up alongside him and one officer, in a regular voice, said, "Hey, you, come here." Id. at 6, 9, 17 and 28. The officer's car was "catty-corner" toward the defendant—angled with its tail end about five to ten feet from the curb. Id. at 9, 19; see also Defendant's Ex. 1. The defendant hung up the phone and asked, "What you stopped me for?" Id. at 10. The officer said nothing in response. Id.

The defendant saw another squad pulling up behind the parked squad car. Id. at 10, 19. A streetlight illuminated the area above where the defendant was standing, so "it [was] pretty light." Id. at 25. The passenger in the second squad was "already out [of] the car with his door open like he was like crouched behind it or something." Id. at 11, 13. The defendant could not see the officer or a gun, but testified that it "seemed like" the officer had a weapon drawn. Id. at 12, 27. The defendant focused on the officer in the first car. Id. at 12.

The defendant described a fluid situation in which the officer reached out of the door of the car and lunged at the defendant while the defendant was "clicking his phone down." Id. at 13, 26. The defendant testified that the officer was "getting out of the car," but that the door was not in between the officer and the defendant. Id. at 13. The defendant said that the officer grabbed the defendant's shirt, but that the defendant "jumped away and took off running." Id.

On cross-examination, the government asked the defendant how the officer was able touch his shirt when the defendant was on the sidewalk and the car was parked so far from the curb. Id. at 19. The defendant explained that the defendant had taken a couple of steps towards the officer when the officer said, "come here." Id. at 19-20. The defendant said that he never turned his back as he walked toward the officer, because the defendant had a gun "on [his] backside." Id. at 28. He testified that that situation changed when the officer lunged, and the defendant took off running through a yard and across the street, cutting back through the yards to 65th Street. Id. at 21. The defendant testified that he ran because he had a gun on him. Id. at 29. He ran for three to four minutes before the officer chasing him made the arrest Id. at 13-14, 22.

Once the defendant arrived at the station, he gave a statement to the police (which was videotaped).[1] Id. at 14-15. While the defendant conceded at

---

[1] As it turns out, he provided *two* statements to the police. First, he talked to Officer Milone. Neither party provided the magistrate judge with the video of

the hearing before Judge Jones that he had not included "every detail piece by piece" in the statement he gave to Detective Vartanian, he also testified that he did not intentionally leave out any details. Id. at 15. The defendant told Judge Jones that he did not think the details about the arrest were relevant at the time he gave the statement to the police. Id. Rather, he told the court that he believed the purpose of the statement was to discuss possible cooperation with authorities. Id. at 16. The defendant said that he did not realize he might be held to the exact statement in the future, but he remembered telling the detective during the interview that he ran from police because he had a gun. Id. at 16, 24. The defendant admitted that he knew it was illegal for him to carry a gun because he he had two prior felonies: (1) possession with intent to distribute cocaine in 2007; and (2) assault with a dangerous weapon in 2012. Id. at 23, 24.

### 2. Officer Milone's Version

Milone had a different version of the events. Milone, an eleven-year veteran of the Milwaukee Police Department, works the "late power shift" (between 7 p.m. and 3 a.m.) in District 5. Id. at 33. On the evening of June 26, 2016, Milone was the passenger in a squad driven by his partner, Officer Chad Boyack. Id. at 33-35. Detective Bill Feely informed Milone and Boyack (and two

---

Officer Milone's post-arrest interview of the defendant. Dkt. No. 53 at 5. The defendant submitted it to *this* court when he filed his objection, dkt. no. 52 at 6, n.1, and labeled it Exh. 8. (At the evidentiary hearing before this court, the parties changed the exhibit number to Exh. 11, realizing that they already had another Exh. 8.) The defendant also gave a statement to Detective Vartanian the morning after his arrest.

other squads) that a confidential informant, who had provided information as recently as eight days before this incident, had said that a person named Brian Bell, a convicted felon, had a hand gun. Id. at 35-36. The informant said that Bell was somewhere in the area of North 60th and West Congress Streets. Id. at 36. Milone and Boyack verified that the defendant was a convicted felon, id. at 37, and began to search for the defendant around 60th Street and Congress, using his mug shot photo, which they'd pulled up on the computer in their car, id. at 36-37.

Milone, who had his window down, said that the two were traveling westbound on West Congress Street in the 6300 block (between 63rd and 64th) when they saw the defendant walking westbound on the north sidewalk of Congress. Id. at 38. As they approached, the defendant looked back for a "second, second and a half," and Milone recognized him (noting his long braided hair). Id. The officers were approximately thirty feet away when the defendant turned to look back at them. Id. After he turned away, the defendant grabbed his right front pocket with his right hand, as he turned right to start walking northbound on the east sidewalk of 64th Street. Id. at 38-39.

According to Milone, the officers (still in the car) were about fifteen feet away when the defendant looked back at them for a second time, then began running north, then east through people's yards. Id. at 39. The squad was still in motion at this point. Id. Milone did not say anything to the defendant before the defendant started to run. Id. at 40. Milone started chasing the defendant on foot, shouting, "Stop, police." Id. at 41. Milone described the pursuit:

He refused to stop and continued running north eastbound towards the alley. As he reached—or was just about to reach the alley I observed some type of dark object drop from his person. I wasn't sure what it was, and then as he began to make the turn northbound of the alley I observed his right hand come towards his front right side and come away with some type of dark colored hand gun in his hand, in his right hand.

He then began—he continued running northbound through the alley. At that point I lost sight of him behind a garage. I was finally able to reach the alley myself. As I'm running behind him he's still running northbound. At that point I don't observe a firearm in either of his hands.

Id. at 41-42. Milone testified that he was about forty-five feet away from the defendant while pursuing him, and that he had a flashlight pointed on the defendant the whole time. Id. at 43. Milone testified that he eventually caught up with the defendant behind 4476 North 65th Street; the defendant was standing by a shed with his hands up. Id. at 42.

Milone testified that he did not have a body camera at the time of these events—he did not receive one until the following month. Id. at 44. He testified that the squad he and Boyack were driving had a squad camera, which they could activate by turning on the lights and siren, or by manually activating it. Id. at 47-48. He testified, however, that he did not activate the squad camera. Id. at 49. He also testified that, although he was the person who chased the defendant, Officer Boyack wrote the police report, based on Milone's observations. Id. at 53-54.

B.     October 23, 2017 Evidentiary Hearing

During cross-examination of Milone, counsel for the defendant handed him a binder labeled Exhibit 4. Id. at 54-55. The government objected,

speculating that the binder contained police reports the defense had obtained through an open records request from the Milwaukee Police Department, and noting that the government had asked for reciprocal discovery of any documents the defense obtained. Id. at 55-56. The government objected to not having received copies of the reports. Id. at 56. After discussion and argument, Judge Jones found that the reports were relevant, and overruled the government's objections to the defense questioning Milone regarding the reports, with some specific exceptions. Dkt. No. 27 at 1. He continued the evidentiary hearing on October 23, 2017. Dkt. No. 29.

When the court reconvened on October 23, 2017, Milone took the stand. Dkt. No. 34. The focus turned back to the binder, which contained the records the defense contended involved Milone chasing and arresting people for "unprovoked flight." Id. at 14. Milone testified that, prior to taking the stand, he had "reviewed [the materials in the binder] partially" and "kind of did a once over on it." Id. at 10. The exhibit began with a list of the names of the people arrested; of the fifty-seven people who Milone had arrested, he speculated that "looking at the names offhand," he recognized thirty or thirty-five. Id. at 12. According to defense counsel, the list contained the names of people arrested as long ago as 2015. Id. at 13. Defense counsel represented that with regard to each person, there was an allegation in the complaint that the person "took unprovoked flight;" Milone could not confirm that. Id. at 14. Milone received a body camera in July of 2016, id. at 17; he could not remember how many of the foot pursuits he caught on a body camera, id. at 19. He explained that

8

there might be reasons why, even after he was issued the body camera, some of the foot pursuits might not have been recorded—the camera might not work, or he might not activate it until it was "safe and practical" to do so. Id. at 20.

On redirect examination, Milone testified that his work on the late power shift in District 5 included participating in "violent crime saturation patrols going on misfiring, ShotSpotter, shots fired, subject with gun, armed robbery calls, as well as trying to be proactive in preventing those types of things from happening." Id. at 28. He testified that District 5 was "unfortunately pretty affected by violent crime." Id. at 29-30. For example, he said that in summer, there might be an average of eight ShotSpotter alerts per night in District 5. Id. at 30. Milone told the court that in a typical shift, he might make about fifty contacts a night with citizens. Id. at 31. While in the Milwaukee Police Academy, he received training on how to recognize signals that a person might be armed, such as that person putting a hand in a pocket or patting the body near the waist. Id. at 33.

As to the specifics of the defendant's arrest, Milone testified that he had recognized the defendant—under the street light—by a distinguishing feature (long hair). Id. at 22. Milone admitted that long, braided hair was "not an abnormal hairstyle in Milwaukee's urban community." Id. Milone denied that the defendant asked Milone why Milone was stopping him and denied that Milone tried to grab the defendant. Id. at 24. Milone also explained that, while there were other squads out looking for the defendant, no squad pulled up

behind him and Officer Boyack at the time Milone left the car to pursue the defendant. Id. at 24-25.

Finally, the defense moved into evidence, without objection from the government, the videotaped statement the defendant gave to Detective Vartanian the day after he was arrested. Id. at 48.

    C.    <u>Exhibit 6: Interview at the Police Station</u>

Chad Vartanian, an MPD detective, interviewed the defendant at the station the morning following his arrest. Ex. 6. Vartanian entered the room at 11:36:23 with cigarettes, a candy bar and a Coke for the defendant. Id. Vartanian immediately left, and returned at 11:38:07 to read the defendant his <u>Miranda</u> rights. Id. The defendant acknowledged that he was familiar with his rights; Vartanian read them again. Id. After waiving his rights, the defendant said he was willing to talk. Ex. 6 at 11:38:07-11:42:08. The defendant provided background information (name, address, phone numbers), and said that he had just gotten off parole in May of the previous year. Id. at 13:40:23–11:30:55. He denied taking any medications or being under the influence. Id. at 11:41:37-11:41:46. The defendant said that he'd graduated from Bayview. Id. at 11:42:03.

Vartanian asked the defendant to tell Vartanian what happened. Id. at 11:42:25. The defendant told his story—he walked down Congress to the gas station. He saw a police light and turned the corner, and the police turned the corner. The officer said, "Hey you come here." The defendant took off running because he had a gun (Smith and Wesson .40) and knew he shouldn't have it.

Id. at 11:44:07. The defendant admitted he ditched the gun with his right hand because he was right-handed. 11:44:20-11:44:25. The defendant said the officer started running first. Id. at 11:44:32. He described his flight pattern, and how he threw the gun overhand (he demonstrated the movement in the video) at a "big-ass house with gates." 11:45:05-11:45:12. Until that point, Vartanian never mentioned cooperation. It wasn't until after the defendant gave his version of the events that Vartanian said he would come back so they would talk about what the defendant could do to help himself out. Id. at 11:45:26-11:46:48.

D.   Exhibit 7: Milone and Boyack's Report

The parties did not introduce Milone and Boyack's report into evidence at either part of the evidentiary hearing, but the defendant attached it to his brief (without objection) and referred to it as Exhibit 7. Dkt. No. 38-1.[2] In addition, Judge Jones relied on the report in his recommendation.

The report, which Boyack had prepared, stated in relevant part:

BELL turned and looked directly at our marked squad car then turned back around while grasping his right front shorts pocket with his right hand. BELL took immediate and unprovoked flight on foot north on the east sidewalk and then eastbound onto the residential yards of the 4400 block of North 64th Street. P.O. MILONE exited the squad car and began chasing BELL on foot while shouting, "Stop! Police!" While running northeast through the yards toward the alley, P.O. MILONE had his L.E.D. flashlight illuminated and pointed at BELL as P.O. MILONE observed a dark object drop to the ground from BELL'S person. P.O. MILONE then observed BELL reach toward his front side with his right hand. P.O. MILONE observed BELL'S right hand come away from his

---

[2] At the April 24, 2018 evidentiary hearing before this court, the parties called the report Exh. 20.

right side as he observed BELL now had a dark colored gun in his right hand. BELL then ran northbound past a garage as P.O. MILONE lost sight of BELL for a moment. Once P.O. MILONE reached the alley, he observed BELL running northbound in the alley without a firearm in either hand.

Id.

## III.    LEGAL ANALYSIS

The legal question before Judge Jones, and before this court, is when Milone "seized" the defendant for Fourth Amendment purposes. The defendant argued that he was "seized" when Milone grabbed his shirt, after telling him to "come here." The government argued that officers "seized" the defendant when they took him into custody by the shed on North 65th Street—after he had fled, and tossed the gun. As Judge Jones stated in his decision, "[d]ue to the absence of any video evidence capturing the encounter, this factual dispute essentially turns on a credibility issue: Does the Court believe Officer Milone or Mr. Bell?" Dkt. No. 51 at 10.

### A.    Governing Law

For Fourth Amendment purposes, law enforcement officers "seize" someone when, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Florida v. Bostick, 501 U.S. 429, 437 (1991) (quoting Michigan v. Chesternut, 486 U.S. 567, 569 (1988)). As the Supreme Court has conceded, this determination is "imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular

details of that conduct in isolation." <u>Chesternut</u>, 486 U.S. at 573. "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurrs." <u>Id.</u>

The Fourth Amendment generally prohibits law enforcement officers from seizing someone without probable cause. <u>Terry v. Ohio</u>, 392 U.S. 1, 20 (1968). There is an exception for an investigatory stop. <u>United States v. Ruiz</u>, 785 F.3d 1134, 1141 (7th Cir. 2015). Police officers may detain a suspect for a brief investigatory stop if they have a "reasonable suspicion based on articulable facts that a crime is about to be or has been committed." <u>United States v. Williams</u>, 731 F.3d 678, 683 (7th Cir. 2013) (quoting <u>United States v. Carlisle</u>, 614 F.3d 750, 754-55 (7th Cir. 2010)). Reasonable suspicion "is more than a hunch but less than probable cause and considerably less than preponderance of the evidence." <u>Jewett v. Anders</u>, 521 F.3d 818, 823 (7th Cir. 2008) (internal quotations omitted). It requires "some minimal level of objective justification for making a stop," given the "totality of the circumstances" and "common-sensical judgments and inferences about human behavior." <u>Id.</u> (internal quotations omitted).

When used by trained law enforcement officers, "objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion." <u>United States v. Cortez</u>, 449 U.S. 411, 419 (1981). The Supreme Court and the Seventh Circuit have held that "[f]light

13

from a law enforcement officer gives that officer reasonable suspicion to pursue a suspect and conduct a *Terry* stop." United States v. Lawshea, 461 F.3d 857, 859 (7th Cir. 2006) (citing Illinois v. Wardlow, 528 U.S. 119, 123–26 (2000)). Because courts evaluate reasonable suspicion in light of the totality of the circumstances, "behavior which is susceptible to an innocent explanation when isolated from its context may still give rise to reasonable suspicion when considered in light of all the factors at play." United States v. Baskin, 401 F.3d 788, 793 (7th Cir. 2005).

   B.    Application of the Law to the Facts

   Because the issue of when Officer Milone "seized" the defendant came down to the question of whether the defendant's version of events or Milone's was the more credible, Judge Jones looked to the factors the Seventh Circuit's pattern jury instruction provides for jurors to consider in determining credibility. Dkt. No. 51 at 10 (citing Pattern Jury 3.01). He cited factors such as the witnesses' "demeanor while testifying, their biases, their ability to perceive the events in question, their memory, their character for truthfulness, whether they have made prior inconsistent statements, and whether their testimony has been contradicted by another source of information (e.g., video footage)." Id. Judge Jones's assessment of these factors led him to conclude that Milone's version of events was more credible than the defendant's.

   At the evidentiary hearing before this court, the defense argued that in fact, both versions of the event arguably were equally plausible, and that if that

were the case, certain factors ought to nudge this court in favor of the defendant's version. The court disagrees.

Judge Jones found that "[t]he demeanors of Mr. Bell and Officer Milone appeared to be equally sincere and composed" at the hearings before him on October 11, 2017. Id. This court's experience was different. While Officer Milone was calm, composed and responsive to questions by both counsel at the hearing on April 24, 2018, the defendant was not. At the April 24, 2018 hearing before this court, the defendant appeared frustrated and somewhat hostile, both toward his own counsel and toward counsel for the government. He interrupted both lawyers at points to insert answers to the questions he anticipated were coming. At times he appeared agitated. He answered questions with questions, demanding to know what the questioner meant by a certain question or phrase. He alternated between being loud and being difficult to hear. He made faces at certain questions, laughing ruefully or shaking his head. His testimony was less detailed than his testimony before Judge Jones, and less precise. When he returned to counsel table, he slumped into his seat, and during the government's argument, visibly expressed frustration and disagreement.

As to biases, Judge Jones found that both men had reason to "shade events to their own advantage: one to avoid jail, and the other to avoid having a prior felon walking the streets with a firearm." Id. This court agrees that both men arguably had motive to color events in their own ways. The defendant admitted in the April 18, 2018 hearing that he had been to prison before, and

did not want to go back. The defense has gone to great pains to gather documents about Milone's arrest history, implying without directly stating that Milone may have a history of manufacturing facts to make unlawful stops and arrests appear lawful. The implication is that, if Milone were to "admit" what actually happened on that night in June, it would reveal that he was lying about having a reasonable suspicion to chase and arrest the defendant.

Judge Jones saw no reason why either man should have any problem perceiving the events in question; this court agrees. Granted, it was dark, but both men testified that the area was illuminated by street lights. Both men are young and healthy, and neither man testified to anything that might have obstructed their views of events. The defense questioned Milone about his ability to identify the defendant from some thirty feet away, using a mug shot; the court did not find this particularly persuasive, given the defendant's distinctive long braids (a style in which he still wore his hair as of the April 24, 2018 evidentiary hearing).

Judge Jones found that neither man appeared to suffer from memory lapses. <u>Id.</u> At the April 18, 2018 hearing before this court, both men testified to things they could not remember specifically. The defendant, however, remembered some facts differently than he had remembered them at the October 11, 2017 hearing before Judge Jones. For example, at the October 11, 2017 hearing, the defendant testified that Boyack and Milone's squad parked catty-corner to the street, with the nose of the car toward the curb and the tail end five to ten feet away from the curb. At the April 24, 2018 hearing, he

testified that the tail of the car was one to two feet from the curb, and became somewhat argumentative when that discrepancy was pointed out to him.

Judge Jones concluded that "each version of events appears equally plausible in the abstract." Id. at 11. He concluded that while it was plausible that a convicted felon with a gun and outstanding warrants might run upon seeing a police officer, it also might be plausible that police officers might attempt "to catch off-guard a felon suspected of carrying a firearm in order to confiscate the illegal weapon." Id. The court agrees with that conclusion, as far as it goes, but as to the specific descriptions of what happened that night, the court finds Officer Milone's version more credible, for reasons it will explain.

Judge Jones concluded that Officer Milone had a small edge over the defendant in terms of character for truthfulness, because the defendant had a prior felony conviction. Id. Before Judge Jones, the defendant responded by asserting that Judge Jones himself had made a finding that Milone had testified untruthfully in another case. Id. (citing United States v. Brantley, 16-CR-188 (E.D. Wis. Mar. 13, 2017)). Judge Jones rejected that contention, pointing out that in the previous case, he had found only that Milone had an inaccurate recollection as to a sequence of events. Id. Counsel for the defendant made this same argument before this court in another case in which Milone was the arresting officer, United States v. Demarrel Jones, 16-cr-179 (E.D. Wis.). This court rejected the argument for the very reason that Judge Jones stated—neither Judge Jones, nor district court judge Lynn Adelman in subsequent proceedings, found that Milone had lied in the Brantley case.

17

In this case, however, the defense also has argued that Milone's history of arresting people after alleged "unprovoked flight" casts doubt on the credibility of his claim that the defendant took "unprovoked flight." In both the October 23, 2017 hearing before Judge Jones and the April 24, 2018 hearing before this court, the defendant questioned Milone extensively about the records the defense had obtained relating to Milone's arrests. Milone testified at both hearings that he had not pored over the documents in the Exh. 4 binder. The defense indicated that the binder contained the complaints—drafted by assistant district attorneys, not Milone—in over fifty cases in which Milone had alleged that the defendant had taken "unprovoked flight." Milone never confirmed this, because he testified that he'd not read over each complaint. He testified that he did not prepare the complaints, although he conceded that assistant district attorneys used police reports to prepare such complaints. At the hearing before this court, the defense pointed out two complaints which used identical language to describe what the defendant had said after being caught, even down to the defendants' gestures as they admitted having guns. The defense also pointed Milone to several complaints which used similar or identical language to describe the "unprovoked flight" sequence that led to the arrest of different defendants.

By the time of the April 24, 2018 hearing before this court, the defendant also had obtained body camera footage from a number of the cases resulting from arrests that Milone had participated in after he received his body camera in July 2016. The defense asked Milone whether it would surprise him to know

that he did not activate the camera in a number of those situations, and that in a number of others, he activated it after the foot pursuit had begun. Milone appeared to be unaware that the defense had obtained this footage, but explained at the April 24, 2018 hearing—as he had at the October 23, 2017 hearing—that there were reasons he might not activate the camera, as well as reasons that it might not record.

The defense collected this evidence over the course of the various hearings—it presented some to Judge Jones, while some it has presented only to this court. Before presenting any evidence to any judge, however, the defense made its argument: that this evidence relates to "whether Milone's testimony in this case can be believed in its appropriate context." Dkt. No. 38 at 7. The defendant asked, in his brief in support of his motion to suppress, whether it was believable

> that the mere presence of this particular police officer prompts so many people—all of which are young black men—to take "immediate and unprovoked flight" from him? Or is "unprovoked flight" simply a convenient, and often unverifiable card in this officer's deck of 'observations' he knows support reasonable suspicion?

Id. 7-8.

The defendant raises troubling questions. The Milwaukee Police Department uses "power squads" to "saturate"—to create a visible police presence—in neighborhoods which it considers to be high-crime. These squads operate during the late night and early morning hours. The neighborhoods generally are minority neighborhoods. These power squads make many arrests; this court has seen more than one involving Officer Milone, a foot chase, and

few if any witnesses. The cases this court has seen have involved Officer Milone's word against a defendant's—in at least two, the defendant has been an African-American male with prior convictions.

The fact that officers and prosecutors both use the phrase "took unprovoked flight" in case after case after case also raises troubling questions. Defense counsel asked Milone at the April 24 hearing whether he knew what the word "unprovoked" meant. The court believes that counsel meant the question as a challenge, but it is a valid question to raise in this context. The Dictionary.com provides alternate meanings for the word "provoke"—one may provoke by "incit[ing] or stimulat[ing] (a person, animal, etc.) to action," but one also may provoke by "giv[ing] rise to, induc[ing], or bring[ing] about." An officer driving down the street in a squad car may not by trying to incite or stimulate someone to action. But that officer may well induce a person who is doing something he knows he's not supposed to do to become afraid, and to run. He or she may even induce someone who's done nothing wrong to run, if that person has had a bad experience with police in the past. Law enforcement appears to use the phrase "unprovoked" to mean that the officers did not intentionally do anything to give the citizen a reason to run. But even if an officer doesn't intend anything at all, his or her very presence may be "provocation" for some people to run.

There may well come a time when the facts of a particular case cause a judge to have to decide whether the pattern the defense has identified calls Milone's credibility (or perhaps that of some of his power squad colleagues) into

question, or whether it calls into question this particular method of policing. This is not that case, however, for reasons having to do with some of the other credibility factors.

In determining that the defendant was less credible than Milone, Judge Jones looked to the defendant's prior statements. As noted, the defendant gave one statement to Milone several hours after his arrest, and it was recorded on video. Judge Jones did not have that evidence available to him; the parties did not present it. The morning after his arrest, the defendant gave a statement to Detective Vartanian, in which he told Vartanian what happened on the night of his arrest and admitted that he ran from Milone because he had a gun. Judge Jones had the Vartanian interview—the parties provided it after the October 23, 2017 hearing.

Judge Jones noted that when the defendant described the evening's events to Vartanian, he made no mention of Milone grabbing his shirt, or the presence of the second squad car, or the passenger in the second squad car crouching behind the squad door and possibly having a weapon. Dkt. No. 51 at 12. Because the defendant did not provide all of these details until he testified before Judge Jones over a year after the fact, Judge Jones concluded that the defendant "contrived" these details at a later date. Id. He noted that the interview with Vartanian occurred less than twenty-four hours after the defendant was arrested, when the details would have been most fresh in his mind. Id. This would have been the time, Judge Jones pointed out, for the defendant to report that he'd been stopped, and grabbed, for no reason. Id. The

defendant did not do so—he simply admitted that he'd had the gun, and knew that he should not have had it. Id. The defendant also said, both to Vartanian and to Judge Jones, that the reason he ran from Milone was because he had the gun. Id.

In the briefing before Judge Jones, the defendant countered that his testimony before Judge Jones was substantially the same as his statement to Vartanian—just more detailed. Id. He argued that that he didn't think the details surrounding the arrest were important in the Vartanian interview, because the purpose of that interview was to talk about the possibility of the defendant getting some credit for cooperating. Id. at 13. Judge Jones disagreed, noting that the cooperation subject did not come up until the end of the interview, and that it was clear that Vartanian expected the defendant to be truthful. Id. at 13.

At the April 24, 2018 hearing before this court, defense counsel again argued that the defendant said substantially the same thing both to Vartanian and to this court, but provided more detail to this court. Counsel again argued that the defendant thought that what was important in talking to Vartanian was cooperation, not the details surrounding the arrest. Counsel elicited from the defendant testimony that the defendant had never been trained on how to talk to police and did not have any legal background. Counsel also hinted that the defendant was not the only person to leave out details in one version of events, and to add them in another. He showed Boyack's incident report to Milone, and elicited from Milone an admission that, while Milone had testified

numerous times that the defendant looked back at the squad twice before taking flight, the statement referred to only one incident of looking back.

This court can imagine why the defendant may have been less detailed with Vartanian than he was in his testimony in federal court. In the video of the Vartanian interview, the defendant seemed impatient, animated, ready to just get it over with. He described his walk down Congress, and then sort of threw up his hands and said that he ran because he had the gun and he knew he wasn't supposed to. Vartanian asked a very open-ended question: "So, what happened?" He did not ask the kinds of questions lawyers ask, or walk the defendant through every minute step of the events of the night before. The fact that the defendant's statement to Vartanian was sparse at best is less compelling to this court than another factor.

Judge Jones concluded by looking at whether the defendant's version of events was contradicted by other sources of information. He concluded that it was, because "[s]imply put, Mr. Bell's version of events seems physically implausible given the schematic description he provided." Id. Based on the testimony from the April 24, 2018 hearing, this court could not agree more.

At the April 24, 2018 hearing, the defendant indicated that he was walking northbound on the east side of the street when the squad pulled up. This means that the squad car, with Boyack driving and Milone in the passenger seat, would have pulled up to the defendant's left. The defendant testified that the car stopped a bit ahead of him, or maybe even with him—he was frustrated with the government's attempts to pin him down on this detail—

with the front of the car angled in to the right toward the curb and the rear jutting out into the street one to two feet (or five to ten feet, according to his testimony in October). The defendant testified that from this position, Milone— who was seated in the passenger seat—said to him, "Hey, you—come here," or words to that affect. (At the October hearing, the defendant testified that Milone said this in a "regular voice;" under cross-examination at the April hearing, the defendant became frustrated and told the prosecutor that he did not know what Milone's "normal" voice was and that he didn't know whether Milone was yelling or not.) The defendant testified that he took a couple of steps toward Milone, and said, "What're you stopping me for?," or something like that.

At this point in the defendant's story, he is standing on or near the sidewalk, and Milone is seated in the passenger seat of a squad car to his left. The defendant testified at the April hearing that Milone "lunged" at him. Defense counsel asked the defendant to demonstrate what he meant by "lunged." The defendant—seated in the witness chair—lean his torso forcefully forward and threw both hands into the air in front of him as if he was reaching for something. On cross-examination, the prosecutor attempted to drill down further. The prosecutor asked the defendant whether Milone "jumped" at him. In a somewhat disgusted tone, the defendant responded, "Couldn'tve jumped— he was *sitting*." The defendant insisted that Milone was able to grab his shirt. He also stated that, at a point when he looked back at the squad, Milone was out of the car, running after him.

The defendant's testimony at the April 24, 2018 hearing was confusing and imprecise, but he was adamant that Milone "lunged" for him, and grabbed his shirt, while Milone was *seated* in the passenger seat of the squad. The defendant did not say whether the squad door was open or closed when Milone allegedly conducted this maneuver. Either way, it defies credibility that an experienced police officer who had reason to believe that his suspect was a felon in possession of a gun would attempt to grab that suspect from a seated position inside a car. If the door had been closed, the officer would have been leaning out of the window of the car trying to grab someone on the sidewalk or grass to his right (with the car at an angle). If the door was open, he would have had to reach through the window, or around the car door itself, while still sitting—as the defendant made clear—to reach the defendant.

The defendant's testimony before this court was not credible. His version of events was not credible. The court accepts Milone's version of the events of that night in June.

What remains is for the court to determine whether the events Milone decribed provided a reasonable suspicion for stopping the defendant. They did. Milone testified that he and Boyack received information from another law enforcement officer, Bill Feely (Milone couldn't remember whether Feely was a detective at the time). Feely told the pair that a confidential informant had told Feely the defendant had a felony conviction, had a handgun, and was in the vicinity of North 60th and West Congress. Milone testified that Feely had reason to believe the informant was reliable, because the week before, the

informant had information that led to the arrest of another felon with a firearm. At the April 24 hearing, the defense questioned Milone about his arrest of Herbert Burrows, the defendant whose arrest had resulted from that earlier informant tip.

After receiving this information, Milone testified, he and Boyack ran the defendant's identifying information through the Wisconsin Circuit Court Access Program, and determined that he was a felon. Armed with this information, Boyack and Milone—as well as two other squads with four other officers—headed out to try to find the defendant.

Boyack and Milone pulled up the defendant's mug shot on the computer in their car. They came upon the defendant walking down the sidewalk between 63rd and 64th Streets on Congress—within blocks of where the informant had said he would be. When the defendant looked back toward them, Milone testified, he determined that the defendant was the person they were looking for, given his long hair. Milone testified that at this point, the defendant grabbed the pocket of his shorts with his right hand—a gesture Milone testified was common for people carrying a gun.

At the April 24 hearing, the prosecutor argued that at this point, the officers had a reasonable suspicion to stop the defendant. The defense disagreed, arguing that a simple tip that a person was a felon, had a gun and was at a particular location was not sufficient to justify a stop. See United States v. LePage, 477 F.3d 485, 488 (7th Cir. 2007) ("When a single informant provides the tip that brought police to a *Terry* stop, this court looks to the

amount of information given, the degree of reliability, and the extent that the officers can corroborate some of the informant's information").

The court does not have to decide that question, however, because the officers did not stop the defendant at this time. Rather, they continued behind him as he turned right onto 64th Street and walked north. The defendant turned and looked at them a second time; it is reasonable to infer that at this point, he realized that the officers were following him, and not just driving around. It was at this point that he ran. Milone gave chase, and during the first part of the chase, saw the defendant with the gun, but lost him as the defendant wove through yards and alleys. When the defendant next emerged into Milone's view, Milone no longer saw the gun.

At the earliest, the defendant reasonably would have had reason to believe that he could not go freely about his business when Milone began to chase him, shouting, "Stop—police." By that time, Milone had a tip from an informant that the defendant had a gun, had verified that the defendant was a felon, had found the defendant where the informant said the defendant would be, had seen the defendant "security check" his shorts pocket upon seeing the squad, and had seen the defendant take flight upon seeing that the squad was following him. This was enough—as the defendant has conceded in his post-hearing brief to Judge Jones, dkt. no. 38 at 7—to justify the stop. The stop, and the arrest, were reasonable.

## IV. CONCLUSION

The court **OVERRULES** the defendant's objection to Judge Jones's recommendation, dkt. no. 52, **ADOPTS** that recommendation, dkt. no. 51, and **DENIES** the defendant's motion to suppress, dkt. no. 20. The court's staff will set a date for a telephonic scheduling conference, to discuss the final pretrial conference date and trial date.

Dated in Milwaukee, Wisconsin this 30th day of April, 2018.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**